582 S.E.2d 859

STATE of West Virginia, Plaintiff Below, Appellee

v.

David SRNSKY, Thomas Srnsky, and Brian Srnsky, Defendants Below, Appellants

No. 30896.

Supreme Court of Appeals of West Virginia.

Submitted April 8, 2003.

Decided May 16, 2003.

Dissenting and Concurring Opinion of Justice Maynard July 9, 2003.

Tim C. Carrico, Carrico Law Offices, Charleston, for the Appellants.

Darrell V. McGraw, Jr., Attorney General, Christie S. Utt, Assistant Attorney General, Charleston, for the Appellee.

ALBRIGHT, Justice.

This case involves the joint appeal of three brothers seeking reversal of the January 8, 2002, final orders of the Circuit Court of Tucker County whereby Brian Srnsky was convicted of one count of obstructing an officer, David Srnsky was convicted of one count of trespassing on property other than a structure, and Thomas Srnsky was convicted of one count of trespassing on property other than a structure or conveyance and two counts of removing a "posted" sign. After careful and exacting review of the record,

briefs and argument of counsel in relation to the relevant law, we find the evidence insufficient to support the convictions and consequently reverse the judgments rendered by the circuit court.

## I. Facts and Procedural History

Thomas and David Srnsky own a 40-acre tract of land in Tucker County, West Virginia, which is bounded on three sides by national forest property and on one side by the property owned by brothers Lee and Robert Long (hereinafter "Long Property") in which the Long brothers' mother, Alma Paugh, may also have had an undetermined interest.[1] By virtue of their property being landlocked, the Srnskys approached the Long brothers[2] several times[3] to purchase a right of way through the Long Property to their land. On February 24, 2001, Thomas and David went to the home of Lewis and Pauline Carr, who are the brother-in-law and sister of the Long brothers and at whose residence Lee Long lives. According to the two Srnsky brothers, they went to the Carr residence on February 24 to talk with Lee Long about the Long Property and their visit and discussion with Lee was brief.[4] The parties are not in agreement as to what transpired during the visit to the Carr home, although all agree that the February 24 encounter was recorded by a tape recorder that Thomas Srnsky had concealed in his pocket. The tape of this encounter was entered into evidence.

According to the Carrs and Lee Long, the Carr property is fenced and posted as private property, the visit by Thomas and David was uninvited, and the Srnsky brothers provoked Lee at the outset of the visit by announcing that they had purchased the Long Property and taunted Lee during the course

---

1. In February 2001, Thomas and David Srnsky obtained a quitclaim deed from Alma Paugh. Mrs. Paugh's interest in the land was allegedly a mineral interest with the surface interest belonging to the Long brothers; however, as represented during oral argument, the extent of Mrs. Paugh's interest in the Long Property is not resolved and remains the subject of a civil suit still pending in the circuit court.

2. The Long brothers live at different locations, but neither live on the property abutting the Srnsky tract.

3. Lee testified that the Srnsky brothers approached him about three times and Robert Long testified that he was approached by them around four times.

4. Lewis Carr testified that Thomas and David were not at his residence very long on that date and Pauline Carr indicated during her testimony that the brothers were there about five or ten minutes.

of the visit. The Carrs and Lee also maintain that the Srnskys refused to leave when repeatedly asked by the Carrs and Lee Long to do so. Additionally, Lewis Carr testified that since he was unaware that Thomas Srnsky had a tape recorder in his pocket he "didn't know whether [Thomas] had a gun or what but he kept his hand in his pocket all the time." The Srnskys contend instead that they simply walked up on the front porch of the Carr residence and asked to speak with Lee Long when Pauline Carr answered the door. After a short discussion with Lee Long, the Srnskys say that they had begun leaving the premises on a number of occasions but were called back to answer questions posed by the Carrs and Lee Long. According to Lee Long's testimony, the brothers stayed on the porch or within the yard right off of the porch the entire time of the encounter. Testimony of the Carrs and Lee Long also established that after the Srnskys left the Carr property that day they did not return.

On March 1, 2001, Lewis Carr spoke with State Trooper A.R. Clevenger claiming that David and Thomas Srnsky trespassed on his property on February 24, 2001. Trooper Clevenger thereafter filed criminal complaints in the magistrate court of Tucker County charging each brother with the offense of trespassing on property other than a structure or conveyance in violation of West Virginia Code § 61–3B–3(b) (1978) (Repl.Vol. 2000). During this time, Robert Long informed Trooper Clevenger that on February 26, 2001, he too had an altercation with David and Thomas, as well as with Brian and another member of the Srnsky family. Trooper Clevenger filed additional criminal complaints based on the report of Robert Long.[5] Four arrest warrants were thereafter issued based on the complaints filed by Trooper Clevenger, which included warrants for David, Thomas and Brian Srnsky.

Upon obtaining the arrest warrants, Trooper Clevenger, with the assistance of State Trooper Lonnie Faircloth, Deputy Sheriff Edward Surguy, and Department of Natural Resources (hereinafter "DNR") Officer Carlton Wade, took steps to serve the warrants on March 2, 2001. After identifying a vehicle owned by the Srnsky family parked along the side of the road in the vicinity of the 40–acre Srnsky tract and the Long Property, three of the law enforcement officers [6] proceeded on foot approximately a half mile into the woods when they saw four men coming off the top of a ridge.

When the officers came face-to-face with the foursome, the officers asked each person to identify himself and to explain what he was doing on the property. Two of the men, whom the officers had observed were armed, produced identification showing that they were private investigators. One of the investigators testified that the Srnskys had hired them to accompany the brothers on the landlocked Srnsky property for protection. Although the two remaining men in the group would not identify themselves or offer an explanation of what they were doing on the property, Trooper Clevenger recognized one of them as Thomas Srnsky and placed him under arrest. None of the officers knew the fourth member of the group, although Trooper Clevenger said that he thought the man was a Srnsky because he had features similar to Thomas. The record established that the unidentified member of the group that day was Brian Srnsky.

While Trooper Clevenger was arresting Thomas and placing him in handcuffs, Brian moved away from the law enforcement officers.[7] When Trooper Faircloth asked Brain what he was doing, Brian immediately stopped and either knelt or squatted at that location. At this point Trooper Clevenger again asked Brian for his name, and Trooper Clevenger arrested Brian when he did not respond to the question.

Before the brothers were transported to magistrate court, Trooper Faircloth's pat down of Thomas Srnsky produced two "No

---

**5.** The charges filed against Brian and the other Srnsky family member are not relevant to the instant case except that they formed the basis for arrest warrants the officers in this case were attempting to execute.

**6.** DNR Officer Wade remained with the vehicles.

**7.** The record reflects that Brian moved no more than five yards.

Hunting/No Trespassing" signs on which the name "Long" appeared. Upon arrival at the magistrate court, Thomas was charged with two counts of unlawfully removing signs posted on the Long Property in addition to the trespass charge already filed. Brian was charged at the magistrate court as "John Doe" for obstructing an officer. A few days later, David Srnsky was arrested on the trespass warrant involving the February 24, 2001, visit to the Carr residence.

A bench trial was held in the Magistrate Court of Tucker County on July 6, 2001, at which Thomas was convicted of trespassing on property other than a structure or conveyance and two counts of removing "posted" signs, David was convicted of trespassing on property other than a structure, and Brian was convicted of obstructing an officer. The punishment imposed upon each brother was the maximum fine allowable under the law for each offense. These convictions were appealed to the Circuit Court of Tucker County.

A single de novo hearing was held on all the appeals in the Circuit Court of Tucker County on January 3, 2001. At the conclusion of the evidence, the lower court announced its judgment from the bench as follows:

> The court finds ... that from the testimony of Mrs. Carr, Lewis Carr and Lee Long ...[,] David Srnsky and Thomas Srnsky are guilty of trespass beyond a reasonable doubt on February the 24th[,] and from the testimony of Mr. Poe and Trooper Faircloth that Thomas Srnsky is guilty of the destruction of property[8] on March the 2nd of each of the posted signs[,] and that [by] the conduct of Brian Srnsky on March the 2nd [he] is guilty of obstructing an officer.

The circuit court then imposed the same punishment as the magistrate court and also directed that the brothers pay court costs. The final orders reflecting the foregoing convictions were entered on January 8, 2002. On the same day, Thomas, Brian and David Srnsky filed their notice of appeal to this Court.

## II. Standard of Review

With regard to his conviction for obstruction, Brian Srnsky maintains that the trial court erred by: (1) not dismissing the charge because the criminal complaint as filed failed to supply sufficient facts to establish probable cause that an offense had been committed; (2) convicting him of an offense for which he was not charged; and (3) finding sufficient evidence to support his conviction. Appeal of each of the convictions of David and Thomas Srnsky for trespassing and the conviction of Thomas for two counts of removing "posted" signs is founded on the claim of insufficient evidence. Consequently, our review of the final order and ultimate disposition of the lower court will be based on an abuse of discretion standard, with the lower court's underlying factual findings reviewed under a clearly erroneous standard and questions of law reviewed de novo. *See* Syl. Pt. 2, *Walker v. West Virginia Ethics Comm'n*, 201 W.Va. 108, 492 S.E.2d 167 (1997). With regard to the allegations of insufficient evidence to support the convictions, our review is based on the principles summarized in syllabus point one of *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995), as follows:

> The function of an appellate court when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt. Thus, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt."

We proceed with our examination of the assigned errors with these standards in mind.

---

**8.** Since Thomas Srnsky was charged with unlawfully destroying and removing two "posted" signs in violation of West Virginia Code § 20–2–

10, we interpret the court's pronouncement to mean that the court found him guilty of the charged offenses.

## III. Discussion

### A. Removal of "Posted" Signs

■ We address the sign removal convictions at the outset since the State has conceded that the trial evidence was insufficient to sustain the convictions. We agree with the State that the provisions of West Virginia Code §§ 20–2–8 (1961) (Repl.Vol.2002) [9] and 20–2–10 (1961) (Repl.Vol.2002),[10] establish that only "[t]he owner, lessee or other person entitled to possession of unenclosed lands" are protected by the criminal sanctions for removal of signs from posted property. W.Va.Code § 20–2–8. *Cf. State v. Williams,* 209 W.Va. 25, 543 S.E.2d 306 (2000) (conviction under W.Va.Code § 61–3–52 requires proof of ownership of land as an essential element of the offense of timbering on the lands of another). Consequently, an essential element of the offense of removing "posted" signs pursuant to West Virginia Code § 20–2–10 is proof that the property on which the signs were posted is owned by someone other than the person charged with the offense of removing or damaging the signs.

■ It is a fundamental principle "[i]n a criminal prosecution, [that] the State is required to prove beyond a reasonable doubt every material element of the crime with which the defendant is charged...." Syl. Pt. 4, in part, *State v. Pendry,* 159 W.Va. 738, 227 S.E.2d 210 (1976), *overruled in part on other grounds, Jones v. Warden, West Virginia Penitentiary,* 161 W.Va. 168, 241 S.E.2d 914 (1978). The record disclosed that the State clearly admitted at the time the Srnskys moved for judgment of acquittal that it could not prove from whose property the signs were removed. Thus, the lower court

erred as a matter of law in finding Thomas Srnsky guilty of two counts of removing signs from posted property, and the judgment of the lower court is reversed.

### B. Trespass

Appellants next assert that the evidence was insufficient to support the conviction of David and Thomas for the charged West Virginia Code § 61–3B–3(b) offense of trespass on property other than a structure or conveyance. Additionally, they assert that if a trespass had occurred on February 24, it was trespass upon a structure, which is a separate offense contained in West Virginia Code § 61–3B–2 (1978) (Repl.Vol.2000).

The criminal complaints involving trespass which were filed in magistrate court against David and Thomas Srnsky are essentially the same and reflect the following information regarding the charge: "On or about 2–24–01 in Tucker County, West Virginia, in violation of W.Va.Code 61–3B–3(b) the defendant (Thomas Srnsky, David Srnsky) did ... [defy] an order to leave, personally communicated to him by the owner." The facts in the complaints filed by Trooper Clevenger supporting the charged offenses relate the following:

> On 3–01–01 Mr. Lewis Carr stated to the ... [undersigned] officer on 3–01–01 that Mr. David (Thomas) Srnsky refused to leave his property on 2–24–01 at apx. 1800 hrs after he had been told by Mr. Carr five (5) to six (6) times. [Undersigned] ... obtained a statement from Mr. Carr regarding this complaint. The ... [undersigned] officer has obtained a tape recording given to the Tucker Co. Sheriffs Office by a member of the Srnsky family. This

---

9. West Virginia Code § 20–2–8 relates to posting of unenclosed lands and states in relevant part:

    The owner, lessee or other person entitled to possession of unenclosed lands may have erected and maintained signs or placards legibly printed, easily discernible, conspicuously posted and reasonably spaced, so as to indicate the territory in which hunting, trapping or fishing is prohibited.

10. In the following manner, West Virginia Code § 20–2–10, establishes the offense for destroying the signs authorized in West Virginia Code § 20–2–8:

    It shall be unlawful and shall constitute a misdemeanor offense for any person to destroy, tear down, shoot at, deface or erase any printed matter or signs placed or posted by or under the authority of this chapter: Provided, however, That this section shall not apply to the owner, his agents, tenants or lessees, of the lands on which such signs or printed matter are posted. Each such sign so destroyed, torn down, shot at, defaced or erased shall be considered a separate offense under this section.

recording states that Mr. Carr told Mr. David (Thomas) Srnsky to get off his property apx. (8) eight times until Mr. David (Thomas) Srnsky left. Mr. Carr also states [sic] to Mr. Srnsky to shut the gate behind him. A copy of Mr. Carr's statement is attached to this criminal complaint.[11] Mr. Carr's property is located apx. .3 miles south of the int. of Rt. 72 and SSR–26 (Richford Rd) Tucker County, WV.

The full text of the trespass offense charged in the complaint appears in West Virginia Code § 61–3B–3(b) as:

If the offender defies an order to leave, personally communicated to him by the owner, tenant or agent of such owner or tenant, or if the offender opens any door, fence or gate, and thereby exposes animals, crops or other property to waste, destruction or freedom, or causes any damage to property by such trespassing on property other than a structure or conveyance, he shall be guilty of a misdemeanor, and, upon conviction thereof, shall be fined not less than one hundred dollars nor more than five hundred dollars or imprisoned in the county jail for a period not to exceed six months, or both such fine and imprisonment.

■ The State argues that David and Thomas Srnsky committed the charged offense when they entered the Carr's property by driving through a gate at the beginning of the road leading to the Carr home, because the property was posted with "no trespassing signs" and the property was fenced. The record simply does not bear out this assertion. Mr. Carr's testimony established that the road leading to the Carr property, including the gate where the road began, was maintained by Mr. Carr but both were on property he did not own. Nonetheless, Mr. Carr had posted "private property" signs in that area as well as on the fence surrounding

the Carr house and property. The record also reveals that even though David and Thomas Srnsky were not invited to the Carr home on February 24, 2001, they had visited Lee Long at the residence on previous occasions and Lee did not tell them not to return. The record further shows that the meeting which took place on February 24, 2001, occurred on the porch or the yard immediately off of the porch, all within the curtilage of the Carr home. Clearly, the brothers could have been charged with trespass in or upon a structure or conveyance, including the curtilage, but no effort was made by the prosecution to amend the charging document.[12] We simply cannot support the State's efforts to construe the evidence to fit the charged offense. Consequently, even when the evidence is viewed in the light most favorable to the prosecution, the State failed to establish the essential elements of the charged West Virginia Code § 61–3B–3(b) offense of trespassing on property other than a structure. Accordingly, we conclude that the lower court erred as a matter of law and reverse the convictions of David and Thomas Srnsky for trespass.

### C. Obstruction

The final assertion of the appellants is that Brian's conviction for obstruction should be reversed because refusing to give one's name to a law enforcement officer does not constitute the offense of obstruction.

Brian was arrested and charged with obstructing a police officer in violation of West Virginia Code § 61–5–17(a) (2000) (Repl.Vol. 2000),[13] which provides:

Any person who threats, menaces, acts or otherwise, forcibly or illegally hinders or obstructs, or attempts to hinder or obstruct, any law-enforcement officer, probation officer or parole officer acting in his or her official capacity is guilty of a misde-

---

11. The referenced attachment was not part of the record accompanying this appeal.

12. A criminal charging document may be amended to correct statutory citation or omission errors regarding the offenses charged. *See* W.Va. Mag. Ct. R.Crim. P. 6(b); W.Va. R.Crim. P. 7(c)(3).

13. West Virginia Code § 61–5–17(a) was amended in 2002, changing language referencing the discretion of the court with regard to the penalty. This portion of the statute now reads: "shall be fined not less than fifty nor more than five hundred dollars or confined in the county or regional jail not more than one year, or both."

meanor and, upon conviction thereof, shall be fined not less than fifty nor more than five hundred dollars, and may, in the discretion of the court, be confined in the county or regional jail not more than one year.

The complaint which was filed subsequent to Brian's arrest against "John Doe (last name Srnsky)" and signed by Trooper Clevenger alleged that: "On 3–02–01 the ... [undersigned] officer was executing arrest warrants on Thomas Srnsky and another member of the Srnsky family. This member refused to identify himself to the ... [undersigned] officer on 4 occasions of being asked for his name."

The State advances the argument that the totality of the circumstances supported the conviction for obstruction of an officer. Specifically, the State contends that in addition to Brian refusing to identify himself, other facts established by the evidence which support the conviction for obstruction include: (1) Brian knew Trooper Clevenger had warrants to serve against the Srnsky family and that he was investigating allegations involving a property dispute where threats had been made; (2) Brian physically attempted to leave the officers' presence; (3) Brian verbally threatened the officers; and (4) Brian provided the officers with a false name. Our examination of the record does not disclose the same facts.

■ As to the State's first contention regarding the facts, Trooper Clevenger's actual testimony regarding what he said to the Srnskys was: "At the time I was making the arrest, one of the individuals—I don't know which one it was—asked if we knew where we were at and I replied, 'No, I have arrest[ ] warrants and I am doing an investigation.'" According to the testimony of the other officers who had approached the brothers that day and of Mr. Poe, who was one of the private investigators accompanying the brothers, no one made the general announcement upon approaching the foursome in the woods that the officers were serving arrest warrants, who the arrest warrants were for, or what caused them to be issued.

The State's second assertion that Brian attempted to leave the officers' presence is not a completely accurate representation of what the record revealed. Trooper Clevenger said that he did not know if Brian was fleeing or not and that Brian did not fight or resist him in any way. The testimony of the other officers at the scene was that Brian immediately stopped when questioned by Trooper Faircloth as to where he was going. Trooper Faircloth further said he did not view Brian's walking "five paces" as an aggressive gesture, nor did Brian resist him in any other way. The deputy sheriff testified that no one at the scene tried to fight or run.

With regard to Brian verbally threatening the officers, the testimony of the officers present at the arrest was that *someone* said something to the effect of "you don't know who you are f---ing with," but no one was able to unequivocally attribute that remark to Brian. The transcript reveals that during the course of the bench trial in circuit court there was a great deal of confusion in identifying one brother from the other. For example, several witnesses identified the brother sitting immediately next to the defense attorney as not being Thomas, yet the lower court later in the proceedings clarified that the brother sitting next to the attorney was indeed Thomas.

The record likewise does not establish a direct connection with Brian being the brother who provided a false name to the officers. The only testimony regarding the false name was given by Mr. Poe, when he said in response to a question posed by the appellants' trial attorney:

> The only other comment that comes to mind when Mr. Srnsky, the one directly beside you, was in a vehicle [and] Trooper Clevenger had asked him his name and he had came back with like a Betsy Roy or a name like that, and that was the only other comment that I observed.

As previously noted, the brother sitting next to the defense attorney was Thomas, not Brian.

Contrary to the lower court's finding, the foregoing facts do not establish a reason for Brian's arrest for obstructing an officer other than that stated in the complaint, that is, refusing to give his name to Trooper Cleven-

ger on four occasions. Hence, the issue we now need to resolve is whether the refusal to give one's name to a police officer, standing alone, constitutes the offense of obstructing a law enforcement officer.

Our review of decisions from other jurisdictions which have considered this issue has not proven useful because they represented situations dissimilar to the one before us, either due to the language of the statutes involved or the other factual circumstances surrounding the refusal to provide identification. *See e.g., People v. Quiroga,* 16 Cal. App.4th 961, 20 Cal.Rptr.2d 446 (1993) (conviction upheld when person refused to give name after being arrested for a drug offense committed in the arresting officer's presence); *D.G. v. State,* 661 So.2d 75 (Fla.Dist. Ct.App.1995) (conviction reversed because juvenile's verbal protests and refusal to answer questions of police did not involve the requisite physical opposition or threats under the state's obstruction statute); *People v. Weathington,* 82 Ill.2d 183, 44 Ill.Dec. 496, 411 N.E.2d 862 (1980) (reversed conviction because refusing to give a name does not involve any physical resistance which statute required); *State v. Hauan,* 361 N.W.2d 336 (Iowa Ct.App.1984) (conviction reversed where accused was sitting in a private club refused to give his name to police who were executing a search warrant on the premises because accused did not interfere with the performance of an official duty); *East Brunswick Tp. v. Malfitano,* 108 N.J.Super. 244, 260 A.2d 862 (N.J.Super.Ct.App.Div.1970) (under a local ordinance making it unlawful to disobey a lawful order or instruction of an officer, court upheld conviction for obstruction because the accused refused to provide identification after the officer told the accused that he was responding to a report involving trespass and informed the accused that the party filing the report intended to swear out a complaint on the charge); *State v. Andrews,* 123 N.M. 95, 934 P.2d 289 (Ct.App.1997) (conviction upheld where accused, stopped for speeding, admitted that he intentionally was concealing his identity from the officers because he did not want the officers to discover he was driving with a revoked license); *State v. Turner,* 103 Wash.App. 515, 13 P.3d 234 (2000) (obstruc-

tion upheld because accused not only refused to give his name to the police but also disobeyed orders to raise his hands and to exit a vehicle as well as provided false information and lunged at a police officer). *See generally* Christopher Hall, Annotation, *What Constitutes Obstructing or Resisting Officer, in Absence of Actual Force,* 66 A.L.R.5th 397 (1999).

While this Court has never squarely addressed whether refusing to identify oneself to a police officer may subject a person to the charge of obstructing an officer, we have had the opportunity to study and define other related issues involving the offense. In *State v. Johnson,* 134 W.Va. 357, 59 S.E.2d 485 (1950), we concluded that actual force or violence is not a necessary element of the crime of obstructing an officer as defined by West Virginia Code § 61–5–17. We stated in *Johnson* that "[t]he words 'forcibly or illegally' used in the statute clearly mean any unlawful interference with the officer in the discharge of his official duties, whether or not force be actually present." 134 W.Va. at 360, 59 S.E.2d at 487. This conclusion was later followed in *State v. Jarvis,* 172 W.Va. 706, 310 S.E.2d 467 (1983), when we advanced in the syllabus that "[a]ny person, upon being advised by a police officer that he is being arrested pursuant to a warrant, who flees in an automobile or otherwise and thereby avoids immediate arrest" is guilty of obstruction. We further recognized in *Jarvis* that a person does not unlawfully obstruct an officer by simply asking questions. *Id.* at 709, 310 S.E.2d at 470. We elaborated on this premise in *State ex rel. Wilmoth v. Gustke,* 179 W.Va. 771, 373 S.E.2d 484 (1988) by saying:

> Our observation in *Jarvis* is consistent with the general rule that when done in an orderly manner, merely questioning or remonstrating with an officer while he or she is performing his or her duty, does not ordinarily constitute the offense of obstructing an officer.

*Id.* at 773, 373 S.E.2d at 486 (citations omitted).

In *Wilmoth,* the owner of a parking lot politely asked a law enforcement officer to

move his vehicle from the lot and go elsewhere to complete the issuance of a traffic citation to someone who had pulled onto his lot. The conclusion we reached as reflected in the syllabus of *Wilmoth* is that a violation of West Virginia Code § 61–5–17 does not occur when a property owner asks a law enforcement officer, "without the use of fighting or insulting words or other opprobrious language and without forcible or other illegal hindrance" to leave his property. This holding was based on the proposition that our free speech protections under our state and federal constitutions [14] extend to verbal criticism directed to the police. Our reasoning in *Wilmoth* included reliance upon the following statement from the United States Supreme Court decision in *City of Houston v. Hill,* 482 U.S. 451, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987): "The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." 179 W.Va. at 773–74, 373 S.E.2d at 486–87 (citation omitted). We later had the opportunity to apply our holding in *Wilmoth* in *State v. Davis,* 199 W.Va. 84, 483 S.E.2d 84 (1996). Although finding that the overall demeanor and threatening manner of Davis constituted a violation of the obstruction statute, we again recognized that "not every act of questioning the authority of a police officer constitutes obstruction." Id. at 86, 483 S.E.2d at 86.

■■■■ Our previous decisions lead us to conclude that refusing to give one's name to a police officer, standing alone, does not constitute obstruction. The evidence in the case before us does not establish that Brian unlawfully interfered with the officers carrying out their duties since he was not under arrest at the time he was questioned and he was not informed by the officers that they had a warrant for his arrest or the basis on which the warrants they had were issued Moreover, if mere questioning of an officer does not constitute unlawful obstruction, it stands to

reason that silence *alone* cannot establish the offense. Consequently, we hold that refusal to identify oneself to a law enforcement officer does not, standing alone, form the basis for a charge of obstructing a law enforcement officer in performing official duties. However, the charge of obstructing an officer may be substantiated when a citizen does not supply identification when required to do so by express statutory direction or when the refusal occurs after a law enforcement officer has communicated the reason why the citizen's name is being sought in relation to the officer's official duties. Thus, we find that the lower court erred as a matter of law and reverse Brian Srnsky's conviction for obstructing an officer in carrying out an official duty.

Our discussion here addresses the narrow question of whether failure of a citizen to give one's name when asked by a law enforcement officer, without more, constitutes the offense of obstructing an officer.[15] The decision we have reached today presents no obstacle to a well-trained law enforcement officer engaging in the performance of his duties. Any communication by an officer as to the reason why the name of the citizen who is approached is needed, such as providing the name of the person appearing on an arrest warrant the officer is attempting to execute and/or otherwise disclosing the need for the investigation, may well be sufficient to support an obstruction charge. It is plain that no reasonable attempt was made to communicate the officers' purpose in the instant case.

## IV. Conclusion

As a result of our review, we reverse the January 8, 2002, orders of the Circuit Court of Tucker County by which Thomas Srnsky was convicted of two counts of removing "posted" signs, Thomas Srnsky and David Srnsky were each convicted of one count of trespassing on property other than a structure or conveyance, and Brian Srnsky was

---

14. *See* W.Va. Const. art. III, § 7; U.S. Const. amend I.

15. Our discussion and resulting conclusion do not encompass situations involving motorists

since motorists are statutorily required as a condition of using the public roadways to comply with orders of law enforcement officers. *See, e.g.,* W.Va.Code § 17C–2–3.

convicted of obstructing a law enforcement officer.

Reversed.

Justices DAVIS and MAYNARD concurred.

Justice STARCHER concurs.

MAYNARD, Justice, dissenting, in part, and concurring, in part.

(Filed July 9, 2003)

I agree with the majority opinion that the trial evidence was insufficient under West Virginia law to sustain the appellants' convictions for removal of "posted" signs. However, I do not believe that the trespassing and obstruction convictions should have been reversed. I find the majority opinion to be a troubling disconnect with reality amounting to a triumph of hyper technical legal analysis over common sense and logic.

With regard to the trespassing convictions, the majority opinion rationalized

> that the meeting which took place on February 24, 2001, occurred on the porch or the yard immediately off of the porch, all within the curtilage of the Carr home. Clearly, the brothers could have been charged with trespass in or upon a structure or conveyance, including the curtilage, but no effort was made by the prosecution to amend the charging document. We simply cannot support the State's efforts to construe the evidence to fit the charged offense.

In essence, the majority concludes that it was a trespassing violation for the Srnskys to be within the curtilage of the home, but this was not the offense with which they were charged by the State. The majority reasons that the Srnskys were not in violation of trespassing outside of the curtilage of the home because the Carrs did not own the road in which the appellants traveled to get to the Carrs' home, thus the State failed to prove that the Srnskys were on property outside the curtilage of the home.

Apparently the majority believes that the Srnskys magically leaped from their vehicle located outside of the curtilage of the Carrs' home, and landed safely and precisely within the curtilage of the home and thus outside of the reach of the statute under which they were charged. Perhaps the Srnskys were able to jump like Michael Jordan in a Nike commercial from their vehicle to the porch of the Carrs without touching any property in between.

The plain fact is, instead of acting as an appellate court, the majority retries the evidence of this case *de novo* and reaches its own conclusion regarding the placement of the Srnskys' feet on the Carr property. It is so obvious to me that the Srnskys committed the crime of trespassing when they left the public road, entered two fences, and walked onto the Carr property prior to reaching the Carrs' home or porch. The trial court in this case heard the evidence and concluded from the facts and testimony that the Srnsky brothers trespassed on property other than a structure. When the evidence is viewed in the light most favorable to the prosecution, I find no reason to disturb the Srnskys' trespassing convictions.

Potentially even more troubling is this Court's reversal of the obstruction charge against Brian Srnsky. I am very disappointed by the outcome of this case as I believe that this Court has rewarded the criminal misconduct of aggressive and bellicose people. Let's look at what really occurred here. Three uniformed law enforcement officers, in possession of valid arrest warrants for Thomas and David Srnsky, came across four unidentified men, two of whom were armed, a half mile into the woods in a rural section of Tucker County. When the officers asked these men their names, two of them refused to answer. One of the law enforcement officers recognized one of the men as a Srnsky brother for whom they held a warrant, and proceeded to arrest this individual—a situation that, for all the officers knew, could have escalated into violence. In fact, sometime during this encounter, one of the four men said to the officers, "you don't know who you are f---ing with."

The majority now asserts that the officers acted inappropriately in this very tense and potentially violent situation. To reiterate, the officers did not know who was confront-

ing them. The four men acted in a recalcitrant, abusive, and perhaps even hostile manner. These officers did not know at the time whether they had stumbled upon illegal activity, such as trespassing, and whether they would meet resistance from these individuals. While it is easy for us to sit in the safe confines of the Capitol and, in hindsight, criticize the conduct of these law enforcement officers, I seriously doubt that any reasonable law enforcement officer who has found himself or herself in a similar situation, facing armed men, on an isolated mountainside, would conclude that these officers did anything wrong. In such situations, officers must think of public safety as well as their own personal safety first. A moment's hesitation, the slightest relaxation, and the result may be gunshots and dead people.

Events that occurred subsequent to Brian Srnsky's arrest indicate that these officers were dealing with men who were openly belligerent and who have absolutely no respect for the law. After being arrested, I believe properly, for obstruction, Brian Srnsky provided the officers with a false name indicating that he was "Betsy Ro[ss] or a name like that." Thereafter, he continued to defy authority by refusing to give his name to a magistrate.

These facts show the reasonableness and the restraint of the police in this case. The majority incorrectly states the relevant issue as, "whether the refusal to give one's name to a police officer, standing alone, constitutes the offense of obstructing a law enforcement officer." But that is simply not what happened in this case. Brian Srnsky's refusal to identify himself *did not* stand alone. Rather it was accompanied by the fact that three law enforcement officers were acting in an official capacity to arrest individuals for whom they carried warrants when they came across armed men deep in the woods, at least one of whom uttered threatening language, and another of whom refused to cooperate and acted in a suspicious manner. The majority's wording of the issue would lead us to believe that police officers randomly approached a pedestrian during lunch time on Capitol Street and gratuitously demanded to know his name absent any introduction or explana-

tion for their inquiry. In fact, the majority's formulation of new Syllabus Point 4 would lead us to think that such a rule is necessary to prevent idle law enforcement officers from badgering innocent citizens with pointless inquiries. Of course, this is not the case and new Syllabus Point 4 is wholly unnecessary.

Brian Srnsky was arrested and charged with obstructing a police officer in violation of West Virginia Code § 61–5–17(a) (2000) (Repl.Vol.2000), which provides:

> Any person who threats, menaces, acts or otherwise, forcibly or illegally hinders or obstructs, or attempts to hinder or obstruct, any law-enforcement officer, probation officer or parole officer acting in his or her official capacity is guilty of a misdemeanor and, upon conviction thereof, shall be fined not less than fifty nor more than five hundred dollars, and may, in the discretion of the court, be confined in the county or regional jail not more than one year.

As the majority explains:

> The complaint which was filed subsequent to Brian's arrest against "John Doe (last name Srnsky)" and signed by Trooper Clevenger alleged that: On 3–02–01 the ... [undersigned] officer was executing arrest warrants on Thomas Srnsky and another member of the Srnsky family. This member refused to identify himself to the ... [undersigned] officer on 4 occasions of being asked for his name."

Given the facts of this case, it is difficult to fathom how Brian Srnsky was not guilty under each and every separate section of the statute as the officers were threatened, menaced, and obstructed while acting within their official capacity. Brian Srnsky knew why the officers were there as Trooper Clevenger announced that he "ha[d] arrest warrants and [was] doing an investigation," yet Srnsky defiantly continued to obstruct the administration of justice by refusing to provide his name, he began to walk away from the officers as they were handcuffing his brother Thomas Srnsky, and he caused an undue burden and a senseless waste of law enforcement time and resources as the officers were forced to arrest and transport him back to

**424**

the county seat for processing before a magistrate.

In sum, in my opinion, the facts of this case indicate that the Srnskys are belligerent individuals who have no respect for authority or the law. The Srnskys deliberately went looking for trouble, they found it, and the authorities properly held them accountable by bringing them to justice. In my view, the majority's decision to reverse the Srnskys' convictions is wrong because the evidence below clearly shows trespass and obstruction of a police officer. The majority opinion will be disheartening to police officers who are regularly called upon to make snap judgments in potentially dangerous situations, but whose reasonably good-faith efforts are further limited by the restrictions of new Syllabus Point 4. It must be equally disheartening to the law-abiding citizens of Tucker County whose efforts to hold the Srnskys accountable for their unlawful and provocative conduct have been repudiated by this Court.

For the reasons stated above, I concur with the majority's reversal of the convictions for the removal of "posted" signs, and I dissent to the reversal of the trespassing and obstruction of a police officer convictions. I am authorized to state that Justice Davis joins me in this separate opinion.